**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIK EMERSON,<br><br>               Plaintiff,<br><br>   -against-<br><br>INSCOBEE INC. and APIMEDS, INC.,<br><br>               Defendants. | Case No.: 26-cv-2812 |

**COMPLAINT**

Plaintiff Erik Emerson, individually and as the Bio Business Representative under the Agreement and Plan of Merger as discussed herein ("Emerson"), by and through his undersigned counsel, as and for his Complaint against Defendants Inscobee Inc. ("Inscobee") and Apimeds Inc. ("Apimeds Korea"; collectively, "Defendants"), alleges on knowledge, information, and belief as follows:

**NATURE OF THE ACTION**

1.      Defendants are parties to certain agreements governing transactions incident to a December 2025 merger transaction described in the allegations below.  Among the many critical terms negotiated and included in the agreements are post-closing protections, which include (*inter alia*) an irrevocable proxy covering certain shares identified in the agreements, restrictions on consent rights, limitations on the disposition of certain assets and intellectual property, and limitations on the issuance or sale of securities.

2.      Notwithstanding these and other unambiguous contract obligations, Defendants have taken recent actions to reconstitute the board and executive team of Apimeds Pharmaceuticals US, Inc. ("APUS"), of which Emerson is a stockholder, to achieve conflicted and self-interested objectives inimical to the best interests of APUS and its minority stockholders.

3.      Accordingly, Plaintiff, as an APUS stockholder and in representative capacities conferred upon him under the agreements, brings this action asserting claims (i) under Delaware statute seeking a judicial determination of and corresponding declaratory relief regarding the present constituency of the APUS board of directors and (ii) for breach of contract.

## PARTIES, JURISDICTION, AND VENUE

4.      Emerson is an individual citizen and resident of the State of Hawaii.  At all relevant times, Emerson has owned 750,000 shares of stock in APUS.

5.      Inscobee is a corporation formed under the laws of the Republic of Korea, with its principal place of business in Seoul, Republic of Korea.  At all relevant times, Inscobee has owned 2,099,747 shares of stock in APUS.

6.      Apimeds Korea is a corporation formed under the laws of the Republic of Korea, with its principal place of business in Seoul, Republic of Korea.  Apimeds Korea also maintains offices at 25 Edinburg Circle, Matawan, New Jersey 07747.  At all relevant times, Apimeds Korea has owned 4,316,618 shares of stock in APUS.

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship among the parties and the amount in controversy is in excess of $75,000.

8.      This Court has personal jurisdiction over Inscobee because Inscobee has contractually consented to be personally subject to this Court's jurisdiction.

9.      This Court has personal jurisdiction over Apimeds Korea because Apimeds Korea has contractually consented to be personally subject to this Court's jurisdiction.

10.     Venue is proper pursuant to 28 U.S.C. §§1391(b)(3) and (c)(3), as Defendants are foreign companies that reside in the Republic of Korea, and have each contractually consented to

appear in this District.

## FACTUAL ALLEGATIONS

### *The APUS Merger Agreement*

11.     Central to this matter is an "AGREEMENT AND PLAN OF MERGER" (the "Merger Agreement"), effective December 1, 2025, which was executed by APUS, Emerson, and the nonparties Apimeds Merger Sub, Inc. ("Merger Sub") and MindWave Innovations Inc. ("MindWave").  A copy of the Merger Agreement is attached as **Exhibit 1**.

13.     Section 7.08(h) of the Merger Agreement designates Emerson as the "Bio Business Representative."  In that capacity, Emerson has the contractual right to monitor APUS' compliance with its obligations under Section 7.08 of the Merger Agreement, to receive regular reports from APUS' management, and, in the event of a breach of Section 7.08, to seek specific performance, injunctive relief, or other equitable remedies, and to bring legal action in any court of competent jurisdiction to enforce the obligations set forth in the Merger Agreement and all subsidiary agreements, including the Support Agreement (as defined and discussed *infra*).

14.     Section 7.08(h) of the Merger Agreement expressly provides that the Bio Business Representative is a third-party beneficiary of Section 7.08 with full enforcement rights.  Section 10.03 of the Merger Agreement confirms that the Bio Business Representative's rights as a third-party beneficiary are enforceable.  Sections 7.08(h) and 10.14(a) of the Merger Agreement provide that the covenants in Section 7.08 are binding on APUS and its successors and expressly survive the Closing.

15.     There are several critical transactions expressly contemplated by the Merger Agreement to occur post-merger.  One of those transactions is the conversion of MindWave's Preferred Stock.  In connection with the Merger Agreement, MindWave received, as consideration

for the Merger, 7,477,017 shares of Series A convertible preferred stock, par value $0.01 per share of APUS (the "Series A Preferred Stock"), which when converted to Common Stock would equal approximately 90.9% of the total issued and outstanding Common Stock of APUS on a fully-diluted basis (the "Conversion Transaction").

16.    Emerson is also named in the Merger Agreement as the CEO and President of Lōkahi Therapeutics, Inc. ("Lōkahi"), a nonparty company wholly owned by APUS which is designated as the "Bio Sub" in the Merger Agreement. Section 7.08(j) of the Merger Agreement grants Emerson, as the Bio Sub Representative, an irrevocable proxy over the shares of Lōkahi to become effective upon the termination of the Interim Period; *i.e.*, upon the Conversion Transaction.

### *The Merger Agreement's Post-Closing Protections*

17.    Section 7.08 of the Merger Agreement establishes a comprehensive framework of protections for the Bio Business and for Lōkahi. In addition to naming Emerson as CEO and President of Lōkahi, the Merger Agreement provides as follows:

a) APUS shall not, without the Bio Business Representative's prior written consent, dispose of, transfer, or encumber any of Lōkahi's intellectual property, assets, or equity interests (§7.08(b));

b) Lōkahi's board of directors shall consist of the individuals serving as APUS directors immediately prior to the Closing, unless otherwise agreed by the Bio Business Representative (§7.08(c)); and

c) APUS shall not issue or sell equity interests in Lōkahi for less than the then-applicable market value (§7.08(j)).

18.    As noted *supra*, these covenants are expressly binding on APUS and its successors, and expressly survive the Closing. Merger Agreement pursuant to §§ 7.08(h) and §10.14(a).

*The Merger Agreement's Governing Law, Jurisdiction, and Enforcement Provisions*

19.    Article X, Section 10.05 of the Merger Agreement provides:

Governing Law. This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

20.    Article X, Section 10.11 of the Merger Agreement further provides:

Jurisdiction; WAIVER OF TRIAL BY JURY. Any Action based upon, arising out of or related to this Agreement, or the transactions contemplated hereby, shall be brought in any state or federal court located in the State of New York, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Action, waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of the Action shall be heard and determined only in any such court, and agrees not to bring any Action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law, or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Action brought pursuant to this Section 10.12. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) EACH

SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS IN THIS SECTION 10.12.

The foregoing cross-reference to "Section 10.12" within the text of Section 10.11 refers to the

Enforcement provision of the Merger Agreement, which provides as follows:

Enforcement. The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties do not perform their obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breach such provisions. The parties acknowledge and agree that (a) the parties shall be entitled to an injunction, specific performance, or other equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, without proof of damages, prior to the valid termination of this Agreement in accordance with Section 10.01, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties would have entered into this Agreement. Each party agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The parties acknowledge and agree that any party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 shall not be required to provide any bond or other security in connection with any such injunction.

21.     On December 1, 2025, the Merger Sub filed a Certificate of Merger, in connection

and accordance with the Merger Agreement, with the Secretary of State of Delaware.  A copy of

the Certificate of Merger is submitted herewith as **Exhibit 2**.

### *The Support Agreement*

22.     Effective the same day as the Merger Agreement, Defendants entered into the

"STOCKHOLDER SUPPORT AGREEMENT AND LOCK-UP AGREEMENT" with APUS (the

"Support Agreement"), pursuant to which Defendants agreed to support and not take any action to interfere with the Merger Agreement and the post-merger transactions.  A copy of the Support Agreement is submitted herewith as **Exhibit 3**.

23.    Article X of the of the Merger Agreement, including Sections 10.05, 10.11, and10.12, are incorporated by reference into the Support Agreement through Section 8(d) thereof.

24.    In Section 4(a)(4) of the Support Agreement, Defendants unconditionally and irrevocably granted APUS a proxy and appointed APUS as their attorney-in-fact to vote the Subject Shares in a manner consistent with Section 4(a).  Specifically, each of the Defendants agreed to "unconditionally and irrevocably grant[] to, and appoint[], [APUS] and any individual designated in writing by [APUS], and each of them individually, as such [Defendants'] proxy and attorney-in-fact (with full power of substitution), for and in the name, place and stead of such Stockholder, to vote the Subject Shares, or grant a written consent or approval in respect of the Subject Shares in a manner consistent with Section 4(a)."

25.    Defendants affirmed that their irrevocable proxy was "coupled with an interest and may under no circumstances be revoked."  The proxy terminates only upon Inscobee, Apimeds Korea, and other APUS stockholders' (collectively, the Stockholders") execution of a "Written Consent," defined in Recital C of the Support Agreement as a consent approving the specific Proposals contemplated by the Merger Agreement that were the animating purpose of the Support Agreement.

26.    Section 7 of the Support Agreement imposes two independent prohibitions on the Stockholders' exercise of consent rights.  First, each Stockholder agreed to "refrain from exercising any veto right, consent right or similar right (whether under the [APUS] Organizational Documents or the Laws of the State of Delaware) which *would impede, disrupt, prevent or*

*otherwise adversely affect the consummation of the Merger or any other transaction*." (Emphasis added)

27.    Second, Defendants each "waive[d] by virtue of signing [the Support Agreement] ... any and all individual approval or consent rights [Defendants] may have under the [APUS] Organizational Documents or the Delaware General Corporation Law ... to which [APUS] is or will be a party, the Merger or any other transaction contemplated by any of the foregoing."

28.    Section 4(a)(2) of the Support Agreement further requires Defendants to vote (or cause to be voted) their shares of APUS stock against any action that would "in any material respect impede, interfere with, delay or attempt to discourage, frustrate the purposes of, result in a breach by [APUS] of, prevent or nullify any provision of the Merger Agreement or any other ancillary document thereto, the Merger, or any other transaction or change in any manner the voting rights of any class of Acquiror's share capital."

29.    Section 4(b) of the Support Agreement further provides that any action attempted to be taken in violation of the Support Agreement's covenants "will be null and void."  In other words, the parties to the Support Agreement expressly agreed that actions taken in breach of the Agreement's voting restrictions, consent waivers, and anti-frustration covenants would be void *ab initio*.  Thus, the purported written consent executed on March 20, 2026 (discussed *infra*) was taken in direct violation of the Support Agreement's covenants and is void by the express terms of the contract.

### *Defendants' Breach of the Support Agreement*

30.    As of February 26, 2026, APUS had 12,575,983 shares of common stock issued and outstanding, as reported in the Definitive 14C Information Statement filed with the SEC on that date.  A majority of such shares, required for a valid written consent under DGCL §228(a), is

6,287,992 shares.  Inscobee owns 2,099,747 shares and Apimeds Korea owns 4,316,618 shares, for a combined total of 6,416,365 shares – a majority.

31.     On March 20, 2026, Defendants, together with certain other stockholders, filed with the Securities and Exchange Commission a Form 13D (the "Form 13D") disclosing that they had purported to take action, in violation of the Support Agreement, to remove all members of the APUS board of directors and replace them with individuals aligned with Defendants' interests (the "Sham Directors"). Specifically, the Form 13D disclosed that the Defendants and their affiliates had:

> [D]elivered an Action by Written Consent of the Stockholders of [APUS] pursuant to Sections 141(k) and 228(a) of the General Corporation Law of the State of Delaware and Section 13 of the Amended and Restated Bylaws of [APUS] (the "Bylaws") pursuant to which, effective immediately as of the delivery of the consent, the [Defendants] approved an amendment to the Bylaws to provide that a majority of the stockholders of [APUS] may appoint directors in the event a vacancy is created and that amendments to the Bylaws may be approved by the holders of a majority of the voting power of the shares of capital stock of the Issuer, removed all of the members of the Board of [APUS] and appointed three individuals designated by the Majority Stockholders to serve as new members of the Board of the Issuer.

A copy of the Form 13D is submitted herewith as **Exhibit 4**.

32.     Also on March 20, 2026, the Sham Directors purportedly caused APUS to file with the Securities and Exchange Commission a Form 8-K in which APUS purported to report that the Sham Directors had taken action to remove and replace APUS' CEO and CFO:

> On March 20, 2026, following the appointment of the newly appointed Directors, the newly-constituted Board removed Dr. Vin Menon as Chief Executive Officer of the Company and from all other positions held at the Company and its subsidiaries, effective immediately, and Mr. Cho was appointed as the new Chief Executive Officer of the Company and Mr. Yu as Secretary of the Company, effective immediately. In addition, the Board removed Mr. Erick Frim as Chief Financial Officer of the Company and from

all other positions held at the Company and its subsidiaries, effective immediately. Mr. Cho was appointed to serve as Chairman of the Board. Each of Messrs. Ji and Yu were appointed to the Audit Committee, Compensation Committee and the Nominating and Corporate Governance Committee of the Board. Mr. Yu was appointed chairperson of the Audit Committee and Nominating and Corporate Governance Committee of the Board and Mr. Ji was appointed chairperson of the Compensation Committee of the Board.

A copy of the Form 8-K is submitted herewith as **Exhibit 5**.

33.    For the reasons stated herein, the purported written consent executed on March 20, 2026 was void and without legal effect.  Accordingly, the incumbent APUS board of directors, consisting of Elona Kogan, Jakap Koo, Carol O'Donnell, and Dr. Bennett Weintraub (as directors, the "Incumbent APUS Directors"; as the board, the "Incumbent APUS Board"), was never validly removed, and remains the duly constituted board of APUS.

34.    Emerson brings this action in his own right and on his own independent standing.

35.    The shares that Defendants purported to vote in connection with the written consent described in the Form 13D were subject to the irrevocable proxy that Defendants granted through the Support Agreement.  APUS, as proxy holder, did not authorize the voting of those shares for that consent.  When Defendants' shares are excluded from the purported consent, the remaining consenting shares (approximately 1,400,000, or 11.1% of outstanding shares) do not constitute a majority of APUS' outstanding common stock as required by DGCL §228(a).

36.    Defendants' purported participation in the written consent described in the Form 13D violated Defendants' express and unconditional waiver of their consent rights memorialized in the Support Agreement.

37.    Defendants' purported participation in the written consent described in the Form 13D violated Defendants' express and unconditional agreement in the Support Agreement to vote

their shares of APUS stock against any action that would "in any material respect impede, interfere with, delay or attempt to discourage, frustrate the purposes of, result in a breach by [APUS] of, prevent or nullify any provision of the Merger Agreement or any other ancillary document thereto, the Merger, or any other transaction …"

38.     The purported and invalid effort to remove the APUS Incumbent Directors responsible for implementing the transactions contemplated by the Merger Agreement, was plainly intended as action which "impedes, disrupts, prevents or otherwise adversely affects" the consummation of these transactions.

### *Violations of Section 7.08 of the Merger Agreement*

39.     Invoking the authority purportedly bestowed upon them by Defendants, and in furtherance of directives from Defendants, the Sham Directors and the officers purportedly appointed by the Sham Directors (the "Sham Officers") have taken and threatened actions that directly violate Section 7.08 of the Merger Agreement.  By purporting to remove the Incumbent APUS Board, the individuals who constitute Lōkahi's board under §7.08(c), and by the purported removal of APUS' CEO, who is responsible for implementing the post-closing covenants protecting the Bio Business, Defendants have impaired the structural protections that §7.08 was designed to guarantee.

40.     Defendants, through the Sham Directors, intend to pursue business strategies fundamentally inconsistent with the Merger Agreement's post-closing framework, including exploring joint ventures with Korean companies in cosmetics, photo booth platforms, and e-commerce – business lines that have no relation to either APUS' existing pharmaceutical business or Lōkahi's biopharmaceutical operations – while simultaneously failing to complete the transactions contemplated by the Merger Agreement.

41.    Moreover, in pre-litigation settlement communications, Defendants demanded the transfer of up to 80% of Lōkahi's equity to Inscobee, the replacement of all Lōkahi directors and officers, and the replacement of Lōkahi's CEO – demands that not only would directly violate Sections 7.08(a), (b), (c), and (j) of the Merger Agreement, but further demonstrate that Defendants' objective in executing the hostile written consent was not to improve APUS governance but to seize control of Lōkahi's assets.

### *Imminent and Ongoing Harm Caused by Defendants' Breaches*

42.    As a direct and proximate result of Defendants' multiple breaches of the Support Agreement and the Merger Agreement, Emerson has and continues to suffer under a cloud of uncertainty that has rendered the management of APUS and its many obligations to its shareholders and third parties untenable.

43.    By way of example, as a direct and proximate result of Defendants' breaches, APUS has failed to complete the Conversion Transaction, the NYSE listing application, and the Private Placement Offering contemplated by the Merger Agreement and related agreements.  APUS' stock price has also been adversely affected by the uncertainty created by Defendants' purported – and invalid – removal of the Incumbent APUS Board.  And APUS' relationships with its financing partners, including Ayrton Capital, have been jeopardized, as the financing is conditioned on the continuation of the Incumbent APUS Board.  Finally, certain contractual allocations to Lōkahi, including the Bio Sub Loan repayment of $2,500,000, the Closing Funds allocation of the greater of 20% or $2,000,000, the PIPE allocation of 10%, and the ongoing fundraising allocation of 5%, are dependent on the successful completion of the financing framework, which Defendants' conduct has imperiled.

44.    Emerson, as the owner of 750,000 shares of APUS stock, has suffered a direct

diminution in the value of his investment as a result of the foregoing.  In addition, Emerson's rights and duties as the Bio Business Representative, including his ability to monitor APUS' compliance with Section 7.08, to protect Lōkahi's assets and governance structure, and to exercise the irrevocable proxy under §7.08(j), have been directly impaired by Defendants' conduct.

45.    Indeed, acting on authority bestowed upon them by and at the direction of Defendants, the Sham Directors and the Sham Officers intentionally have failed to complete several critical transactions expressly contemplated by the Merger Agreement, including the Conversion Transaction.

46.    The Conversion Transaction was to occur automatically on the later of (i) the date that the APUS stockholders approved the issuance of the shares of Common Stock upon the conversion of the Series A Preferred Stock and (ii) the date on which NYSE American LLC ("NYSE") approved any required new listing application.  APUS stockholders approved the issuance in December 2025, satisfying condition (i).  The Conversion Transaction was expected to occur upon NYSE approval of the listing application, which APUS was pursuing on a timeline consistent with a late-March completion.  However, the NYSE has been unable to approve the listing application because Defendants' purported removal of the Incumbent APUS Board has created a governance question that the NYSE must resolve before processing any listing action. The Sham Directors and Sham Officers have failed to take any steps to resolve this obstruction or to otherwise advance the Conversion Transaction to completion.

47.    As a result of Defendants' knowing and intentional actions, and correspondingly the knowing and intentional failure of the Sham Directors and Sham Officers to complete the transactions contemplated by the Merger Agreement, an Event of Default has been asserted against APUS in connection with a Senior Convertible Note issued to ALTO Opportunity Master Fund,

SPC-Segregated Master Portfolio B ("ALTO") pursuant to a Securities Purchase Agreement dated as of December 1, 2025.  On March 25, 2026, ALTO issued a notice of default letter to APUS in which ALTO demanded immediate payment from APUS of $22,088,176.76.  A copy of the ALTO notice of default letter is submitted herewith as **Exhibit 6**.

48.    Indeed, the fallout from Defendants' actions and breaches of contract are myriad. Emerson faces multiple imminent and irreparable harms that cannot be remedied by monetary damages and that worsen with each day of delay, including specifically and without limitation all of the following:

a) APUS' common stock is currently halted from trading on the NYSE in the United States due to the competing governance claims created by Defendants' purported written consent.  Specifically, the NYSE has indicated that it cannot approve the listing application for the conversion shares or restore trading while the board composition dispute remains unresolved.  Prolonged suspension creates an imminent risk of delisting, which would destroy stockholder value and eliminate APUS' access to public capital markets.

b) APUS must file its Form 10-K with the Securities and Exchange Commission by April 15, 2026.  The 10-K requires execution by APUS' principal executive officer and principal financial officer.  With competing claims to those offices, no authorized signatory exists, and failure to file timely will result in loss of S-3 eligibility (APUS's one-year public company anniversary is May 9, 2026), potential delisting, and regulatory consequences that cannot be remedied by monetary damages.

c) The financing agreements underlying APUS's capital structure are conditioned on continuation of the Incumbent APUS Board, and Defendants' actions have disrupted

APUS' governance and triggered cascading defaults, including specifically but without limitation the ALTO Event of Default notice described *supra*.

d) The Conversion Transaction, which would convert MindWave's Series A Preferred Stock into approximately 90.9% of APUS's outstanding common stock on a fully diluted basis, cannot be completed while the board composition remains in dispute, as the NYSE will not approve the required listing application under these circumstances. The inability to complete the Conversion Transaction threatens the collapse of the entire Merger Agreement framework and the departure of the merger partner and its affiliated investors.

e) Public investors holding APUS stock have been unable to make informed buy or sell decisions during the trading suspension, and the company's market valuation cannot be determined while governance remains in limbo.

49.    These harms are not hypothetical or remote; they are occurring now and compounding daily.  Further negative consequences are inevitable absent a definitive adjudication of the rights of the parties to this litigation.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment)**

50.    Emerson repeats and realleges each and every allegation set forth above as if fully set forth herein.

51.    Pursuant to 28 U.S.C. §2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration.

52.    Defendants' actions as described above have created an actual controversy regarding the enforceability of the Support Agreement and the irrevocable proxies Defendants each granted under that agreement,  as well as the validity of Defendants' actions to purportedly

amend APUS' bylaws, remove the Incumbent APUS Directors, and purport to elect the Sham Directors, and the subsequent invalid actions of the Sham Directors to purportedly remove APUS' CEO and CFO and replace them with the Sham Officers.

53.    The internal affairs of APUS are governed by the laws of the State of Delaware. Delaware law, including Delaware statutory law codified at 8 Del. C. § 225 ("Contested election of directors; proceedings to determine validity"), provides stockholders of Delaware corporations a right of action to seek a judicial determination of the constituency of that corporation's board of directors, and authorizes the presiding tribunal to determine all subsidiary facts necessary to make that determination, including specifically but without limitation determinations regarding the validity of stockholder proxy rights, the validity of corporate acts taken by written consent, and the validity of actions thereafter taken by improperly seated boards and the officers they appoint.

54.    This Court, sitting in diversity and applying Delaware law as required by the contractual choice-of-law provisions incorporated into the Support Agreement, has full authority to determine the validity of the purported written consent, the legitimacy of the incumbent board, and the status of the Sham Directors, and to grant declaratory and injunctive relief accordingly. These determinations are necessary incidents of the contractual disputes before this Court and do not require a separate statutory proceeding.

55.    As a matter of law, the facts and circumstances above entitle Emerson to a declaration that Defendants' actions, including their purported votes via action by written consent, be adjudicated void, and that the purported removal of the Incumbent APUS Directors and the purported election of Sham Directors to the APUS Board were invalid *ab initio* and totally ineffective.

56.    Emerson accordingly requests a declaratory judgment as follows:

a) The purported written consent executed on March 20, 2026 was invalid and of no force or effect;

b) All actions purportedly taken by the Sham Directors, including specifically but without limitation the removal of the APUS CEO and CFO and their replacement with the Sham Officers, were and are ineffective and invalid because Defendants had no authority to remove the Incumbent directors and replace them with the Sham Directors; and

c) Granting Emerson his costs and fees incurred in this action, including attorneys' fees, along with such other and further relief as the Court may deem just and equitable.

## SECOND CAUSE OF ACTION
### (Breach of the Support Agreement)

57.     Emerson repeats and realleges each and every allegation set forth above as if fully set forth herein.

58.     The Support Agreement is a valid and enforceable contract executed by each of the Defendants which incorporates by reference all relevant provisions of the Merger Agreement, including specifically but without limitation Sections 10.05, 10.11, and 10.12.

59.     Emerson is a signatory to the Merger Agreement, and as the Bio Business Representative is expressly designated to be a third-party beneficiary of Section 7.08 of the Merger Agreement, with full enforcement rights, including the right to seek specific performance, injunctive relief, and other equitable remedies and all other authority set forth in the Merger Agreement as described herein.

60.     The Merger Agreement is incorporated by reference into the Support Agreement. Emerson's status and enforcement authority in his capacity as the Bio Business Representative extends to the Merger Agreement and all subsidiary agreements, including the Support Agreement. In the event of a breach, Emerson has the right to bring legal action to enforce the obligations set

forth in the Merger Agreement and (by extension) the Support Agreement.

61.    Section 7.08 of the Merger Agreement – incorporated by reference into the Support Agreement – further imposes binding, post-closing obligations with respect to the governance, management, and protection of Lōkahi and the Bio Business.

62.    Defendants have intentionally and materially breached their obligations under the Support Agreement, including specifically but without limitation: (a) their irrevocable proxy obligations under Section 4(a)(4); (b) their consent waiver obligations under Section 7; (c) their anti-frustration covenant under Section 4(a)(2); and (d) the nullity provision of Section 4(b), which renders the purported written consent void by the express terms of the contract.

63.    In furtherance of directives from Defendants, the Sham Directors and the Sham Officers have taken and threatened actions that directly violate Section 7.08 of the Merger Agreement, including specifically but without limitation: (a) purporting to remove the Incumbent APUS Directors who constitute Lōkahi's board under §7.08(c); (b) purporting to remove APUS' CEO, who is responsible for implementing the post-closing covenants protecting the Bio Business; (c) failing to complete the Conversion Transaction; and (d) pursuing business strategies fundamentally inconsistent with the post-closing framework.

64.    Defendants, through the Sham Directors, intend to pursue business strategies fundamentally inconsistent with the Merger Agreement's post-closing framework, including exploring joint ventures with Korean companies in cosmetics, photo booth platforms, and e-commerce – business lines that have no relation to either APUS' existing pharmaceutical business or Lōkahi's biopharmaceutical operations – while simultaneously failing to complete the transactions contemplated by the Merger Agreement.

65.    As a direct and proximate result of Defendants' breaches of the Support Agreement,

Emerson has suffered and will continue to suffer irreparable harm, and has been damaged and will continue to be damaged in an amount to be proven at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

**WHEREFORE**, Emerson respectfully requests that the Court assume jurisdiction herein and thereafter Emerson demands judgment against Defendants as follows:

1. A declaratory judgment as described herein nullifying the removal of the Incumbent APUS Board, the appointment of the Sham Directors and Sham Officers, and the actions described herein as purportedly taken by same;

2. Enjoining the Sham Directors from holding themselves out as directors of APUS or taking any action in any purported directorial capacity;

3. Enjoying Defendants, the Sham Directors, and the Sham Officers from taking any action to hinder or impede the completion of any transactions contemplated by the Merger Agreement;

4. Enjoining Defendants from taking any other action that would violate Section 7.08 of the Merger Agreement, including specifically but without limitation any transfer, encumbrance, or disposition of Lōkahi's assets, equity, or intellectual property without the Bio Business Representative's prior written consent;

5. Ordering specific performance of Section 7.08 of the Merger Agreement, including restoration of the governance protections for Lōkahi's board composition and management;

6. Awarding Emerson monetary damages in an amount to be determined at trial but not less than $75,000, along with interest, costs, and attorneys' fees; and

7. Awarding such other and further relief that the Court may deem just and equitable.

Dated: April 6, 2026
New York, New York

**MONTGOMERY MCCRACKEN WALKER & RHOADS LLP**

By: /s/ Justin Stone

Justin Stone
437 Madison Avenue, 24th Floor
New York, NY  10022
(212) 551-7782
jstone@mmwr.com

**MILES & STOCKBRIDGE P.C.**

Robert S. Brennen (*pro hac vice* to be filed)
William M. Krulak, Jr. (*pro hac vice* to be filed)
100 Light Street
Baltimore, Maryland 21202
(410) 727-6464
RBrennen@milesstockbridge.com
WKrulak@milesstockbridge.com

*Attorneys for Plaintiff*